ROBERT JACKSON MILLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 12058-84
United States Tax Court
T.C. Memo 1991-126; 1991 Tax Ct. Memo LEXIS 144; 61 T.C.M. (CCH) 2203; T.C.M. (RIA) 91126; March 20, 1991, Filed *144 Decisions will be entered under Rule 155. Petitioner owned 30,250 shares of section 1244 stock in a corporation organized to build and operate a water slide. Petitioner's stock became worthless in 1980 when the water slide business failed. Petitioner claimed an ordinary loss in the amount of $ 12,000 for 2,400 shares of section 1244 stock. Held: Petitioner substantiated the basis in his stock and is entitled to an ordinary loss for 2,400 shares of section 1244 stock in the amount of $ 957.34 which represents the basis in those shares. Robert Jackson Miller, pro se. James R. Rich, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioner's Federal income tax for the years 1980 and 1981. The principal issue in this case was decided in Miller v. Commissioner, T.C. Memo 1989-485. The remaining issue in this case is whether petitioner is entitled to an ordinary loss of $ 12,000 in the year 1980 with respect to stock in Mountain-Boggan, Inc., which stock became worthless in 1980 under section 1244.[1] We hold that petitioner has substantiated the basis in *145 his stock, and, therefore, petitioner is entitled to an ordinary loss in 1980 with respect to 2,400 shares of section 1244 stock in the amount of $ 957.34 which represents the basis in those shares. At the hearing, respondent conceded the issue of whether petitioner carried his burden of proof to show that the stock became worthless in 1980. On brief, respondent conceded the issue of whether or not petitioner's stock was issued pursuant to a written plan because the notice of deficiency did not specifically disallow the stock loss on that ground. Respondent did not raise the issue of whether petitioner complied with the requirements of section 1.1244(e)-1, Income Tax Regs. Therefore, we will not discuss whether these requirements were complied with. FINDINGS OF FACT Some of the facts have been stipulated *146 and are so found. The stipulations and attached exhibits are incorporated herein by this reference. When the amended petition was filed, Robert J. Miller, petitioner, was incarcerated in the Federal prison camp at Maxwell Air Force Base, Alabama. At the time that petitioner's incarceration commenced, he was a resident of South Carolina. In the summer of 1977, petitioner and James Swartz, a friend and co-worker, decided that the operation of a water slide business might prove to be a profitable investment for them. However, they did not have any money for this project. In an effort to obtain funds for the project, they applied to banks all over the country and to the Small Business Administration. Even though they expended many hours in pursuit of financing for the project, ultimately, they were unsuccessful. Thus, they were forced to obtain the funds from other sources. In July 1977 they informed Melvin Younts, an attorney, of their plans and asked him to organize a corporation for the purpose of building and operating a water slide. The corporation, Mountain-Boggan, Inc. (the Corporation), was incorporated on May 18, 1977. The articles of incorporation provided that the *147 Corporation was authorized to issue 100,000 shares of common stock at $ 1 par value per share. The articles of incorporation also provided for two directors, petitioner and Mr. Swartz. They each paid one-half of the fees for incorporation or $ 210. Petitioner and Mr. Swartz agreed to share expenses equally. A stock certificate dated July 11, 1977, certified that petitioner owned 30,250 shares of the Corporation's stock. The stock certificate represented all of the shares of stock that petitioner acquired in the Corporation. There is no record of when petitioner's shares were actually delivered to him. The stock certificate was signed by Bernace M. Cochran, the secretary of the Corporation. Ms. Cochran did not become a stockholder of the Corporation until March 1978, and she did not become the secretary of the Corporation until June 12, 1978, when she was elected to that position at a stockholders' meeting. Petitioner and Mr. Swartz located property in Greenville, South Carolina, which was suitable for the location of the water slide. This property was owned by D.A. Burdette. Petitioner and Mr. Swartz entered into a lease agreement with Mr. Burdette to lease the property *148 for a rental of $ 12,000 per year. In November 1977 petitioner and Mr. Swartz each paid Mr. Burdette $ 6,000. Petitioner and Mr. Swartz entered into agreements with Dan Williams of Bacher and Allen, an architect and engineering firm, and Watson Pool Company, a pool and flumes construction company, to design and construct the water slide. These companies began work on the design and construction of the water slide in August 1977. In November 1977 petitioner and Mr. Swartz were unable to pay for the work completed on the water slide. On November 21, 1977, Arbor Engineering filed a mechanics lien in the amount of $ 6,235.69 against the property. Petitioner borrowed money on the equity in his home to pay one-half the amount owed on the mechanics lien. Mr. Swartz paid the balance owed on the mechanics lien. In February 1978 approximately $ 42,000 worth of work was completed on the water slide. Petitioner and Mr. Swartz did not have any money to pay for this work. Another mechanics lien was filed against the property. Mr. Swartz asked a friend of his, Ms. Cochran, for money to satisfy this debt. Ms. Cochran gave petitioner and Mr. Swartz $ 43,000 in return for 20,000 shares *149 of stock in the Corporation. They paid the amount owed on the mechanics lien with this money. During this period, petitioner and Mr. Swartz contributed money to pay for other corporate expenses for the project. These expenses included $ 1,414 owed to Bacher and Allen, $ 244.45 owed to Greenville Printing Company, $ 350 for a building permit, $ 475 for a water meter, $ 500 as a deposit on electricity, $ 300 to run electricity underground, and $ 500 to survey the property. Toward the latter part of 1977, they each paid one-half of the amount due for the building permit. On January 10, 1978, petitioner paid one-half of the amount owed the Greenville Printing Company. Petitioner also paid the balance owed to Greenville Printing Company. In February 1978 petitioner and Mr. Swartz each paid one-half of the amount owed to Bacher and Allen. They each paid one-half of the amount due for the building permit, for the water meter, for the electric deposit, for underground electricity, and for the survey of the property during this period. Petitioner also expended $ 750 for other miscellaneous expenses. Petitioner and Mr. Swartz were dissatisfied with the water flumes. On January 18, *150 1978, they each paid Mr. Younts $ 125 toward a filing fee to initiate a lawsuit against Watson Pool Company. Amount Paid
Purpose of Payment
$    210.00  Incorporation
6,000.00  Lease
3,117.84  Mechanics Lien
707.00  Construction
244.45  Printing 175.00  Permits
237.50  Water Meters
400.00  Electricity Deposit
125.00  Cost of Lawsuit
750.00  Miscellaneous
$ 11,966.79  Total
Petitioner and Mr. Swartz lacked the necessary funds to complete the water slide project. In an effort to obtain more funds, they printed a prospectus on the Corporation to attract investors. They sold shares to petitioner's father and uncle. As the project grew, more people invested in the project. With the funds from these investors, they bought materials to build a game room and to finish the project. Petitioner quit his job in January 1978 to work on the project. Petitioner and his father, with the help of Mr. Swartz, built the game room. The water slide opened May 1, 1978. A stockholders' meeting was held on June 12, 1978. At this meeting, Mr. Younts informed the stockholders that the Corporation would operate under section 1244, so that, in the case of a business *151 failure, the stockholders could claim an ordinary loss on their stock. The business did not succeed. For the period May 1, 1978, through April 30, 1979, the business lost money. In 1980 the landlord terminated the lease, demanded possession of the property, and demanded full payment of the rent due. In 1980 petitioner paid Eubanks and Brannon, an accounting firm, $ 750 to audit the Corporation's books. The parties agree that this expense should not be treated as part of petitioner's payment toward the purchase of his stock. Petitioner claimed an ordinary loss of $ 12,000 with respect to 2,400 shares of stock in the Corporation on his 1980 income tax return. His return reflected that the stock had been acquired in 1978, the basis in his stock was $ 12,000, and his stock became worthless in 1980. In the notice of deficiency, respondent disallowed the ordinary loss of $ 12,000 on the grounds that petitioner failed to establish the basis in his stock or that the stock became worthless within the taxable year. Respondent has not made it clear whether he contends that petitioner is not entitled to an ordinary loss for 2,400 shares of stock or for 30,250 shares of stock. The record *152 indicates that the basis in petitioner's shares, if substantiated, would be $ 11,966.79. The basis in petitioner's 2,400 shares of stock would be $ 957.34 (2,400 / 30,250 X $ 11,966.79 = $ 957.34). If we decide that petitioner is entitled to an ordinary loss on petitioner's section 1244 stock, petitioner will be entitled to an ordinary loss with respect to only 2,400 shares of his stock in the amount of $ 957.34. The amounts paid by petitioner for corporate expenses were never recorded in any corporate books. A corporate checking account was not opened until May or June 1978. Petitioner was never reimbursed for these expenditures. All the corporate records except those in evidence were lost. As requested by this Court at the hearing, counsel for respondent wrote a letter to petitioner's former lawyer, Mr. Younts, to determine whether he had any of the Corporation's records. Mr. Younts informed counsel for respondent that his offices did not have any files or corporate records that related to the Corporation. OPINION Section 165(g)(1) generally provides that if a security which is a capital asset becomes worthless during the taxable year, the resulting loss will be treated *153 as a loss from the sale or exchange of a capital asset on the last day of the taxable year. However, section 1244(a) provides that an individual taxpayer is allowed to treat a loss from section 1244 stock as an ordinary loss rather than as a loss from the sale or exchange of a capital asset. Section 1244(d)(1)(B) provides that "In computing the amount of the loss on stock for purposes of this section, any increase in the basis of such stock (through contributions to the capital of the corporation, or otherwise) shall be treated as allocable to stock which is not section 1244 stock." Section 1.1244(d)-2(a), Income Tax Regs., provides that "If subsequent to the time of its issuance there is for any reason, * * * an increase in the basis of section 1244 stock, such increase shall be treated as allocable to stock which is not section 1244 stock." Section 1244 does not define the term "issue." The definition of the term "issue" is important in this case for two reasons. First, any contributions to a corporation after section 1244 stock is issued is a contribution to capital which increases the basis in the stock, but such increase is not treated as allocable to section 1244 stock. *154 Second, for section 1244 stock issued prior to November 1978, a corporation must adopt a written plan. Sec. 1.1244(c)-1(f), Income Tax Regs. As noted earlier, respondent has conceded the issue of whether or not petitioner's stock was issued pursuant to a written plan. This Court, in Morgan v. Commissioner, 46 T.C. 878, 890 (1966), held that "when stock is paid for, it is normally considered issued in fact, irrespective of the manual issuance of the certificate." This Court also pointed out that "the date of physical issuance of the stock certificate is [not] controlling as to the date of issuance of the stock in ordinary corporate usage and we do not think it was intended to be controlling as to when stock is considered "issued" for purposes of section 1244." Morgan v. Commissioner, supra at 890-891. E.g., Hayden v. Commissioner, 52 T.C. 1112 (1969). Therefore, stock is treated as issued when stock is paid for. Petitioner contends that his contributions of money to pay for corporate expenses should be considered payments toward the purchase of his stock, and, therefore, such payments constitute the basis in his *155 stock. In support of this position, petitioner testified that he never sought reimbursement from the Corporation because he believed that his contributions of money for corporate expenses were payments for his stock. Respondent contends that for purposes of section 1244, petitioner paid $ 210 for his stock when the Corporation was formed in May 1977, and, therefore, petitioner is only entitled to an ordinary loss of $ 210. Respondent argues that the issuance of petitioner's stock certificate is not controlling in determining when petitioner's stock was issued. Respondent maintains that any payments made by petitioner to the Corporation after he paid the $ 210 incorporation fee caused the basis in his stock to increase, and under section 1244(d)(1)(B), such increase is treated as a capital loss. Respondent does not contest that any of the expenses claimed to be paid by petitioner were not actually paid. With respect to the $ 6,000 paid by petitioner to lease the land, respondent argues that the check for that amount, without further explanation, does not substantiate that petitioner had any basis in his stock nor does the check establish that petitioner had a basis of $ 12,000 *156 in his stock. The rule in Morgan v. Commissioner, supra, defines the term "issue." Stock is treated as issued when stock is paid for. However, this rule does not enable us to determine what constitutes petitioner's consideration or basis in his stock. Section 1244 and the regulations thereunder do not require that a stockholder pay for his stock in one lump sum. Section 1244 and the regulations thereunder do not prescribe that ordinary loss treatment is appropriate for only the first payment toward the purchase of section 1244 stock where that stock becomes worthless. Section 1.1244(d)-2, Income Tax Regs., provides that after a taxpayer has paid consideration for his stock, any subsequent contributions to the corporation are considered contributions to capital that are treated as a capital loss if the stock becomes worthless. Section 1.1244(c)-1(f)(1)(iv), Income Tax Regs., contains the language "Pre-November 1978 stock issued for a payment which, alone or together with prior payments." These provisions indicate that all or part of the payments made by petitioner may constitute consideration for his section 1244 stock. In Lichtenberg v. Commissioner, T.C. Memo 1967-130, *157 the taxpayers each made two payments toward the purchase of their stock. The Commissioner adopted the position that the taxpayers became stockholders when they each paid the last amount. This Court and the Commissioner accepted the position that the two separate payments constituted the consideration for their stock. The Corporation in this case was incorporated under the laws of South Carolina. The corporation laws of South Carolina provide that stock may be purchased with one payment or several payments. S.C. Code Ann. secs. 33-9-60, 33-9-100 (Law. Co-op. Cum. Supp. 1985). We have not found any requirement in section 1244, the regulations thereunder, prior Court opinions, or the corporation laws of South Carolina, which would require us to treat petitioner's initial payment of $ 210 as the consideration for his stock. In order to determine what constitutes the basis in petitioner's stock, we must decide what payments petitioner intended to constitute consideration for his stock. Petitioner testified that he believed that by paying one-half of the corporate expenses to complete the water slide such payments would be applied toward the purchase of his stock. There is no written *158 agreement in evidence indicating that petitioner planned on paying for his stock in the form of payments for corporate expenses; however, we accept petitioner's testimony as evidence of his intent to pay for his stock in this manner. Petitioner received 30,250 shares of stock in the Corporation. At the time of incorporation, only petitioner and Mr. Swartz were involved in the project, and they had agreed to split everything equally. If the stock had been issued on the date of incorporation, petitioner would have received 50,000 shares or one-half the shares of stock in the Corporation. It seems plausible then that petitioner did not pay for or receive his stock at that time. Later, when other people invested in the Corporation, the stock was divided among the investors based on their investment in the Corporation. The actual number of shares received by petitioner was most likely based on what was considered his investment (payments for corporate expenses) in the Corporation. Petitioner testified that his stock was not actually delivered to him until July 1978. He further testified that the date on his stock certificate was incorrect and that the stock certificate was issued *159 in 1978. Ms. Cochran's signature on petitioner's stock certificate indicates that it is likely that the stock certificate was not issued in 1977 when the Corporation was incorporated. This is based on the fact that Ms. Cochran did not become a stockholder herself until much later. Therefore, it is reasonable to believe that the stock certificate for 30,250 shares was issued in June 1978 when petitioner claims it was issued. It is also reasonable to conclude that petitioner was issued his stock at that time. If we accept that the stock certificate and stock were issued in June 1978, then the money expended by petitioner up to that point qualifies as consideration for his stock. We believe that petitioner intended that his contributions of money for corporate expenses would be applied as payments toward the purchase of his stock and that these contributions would constitute total consideration for his stock. We conclude that the amounts expended by petitioner for corporate expenses, excluding the accounting fee, constitute the consideration paid by petitioner for his stock. Therefore, petitioner has a basis of $ 11,966.79 in his stock. We hold that petitioner is entitled to *160 an ordinary loss in the amount of $ 957.34 which constitutes the basis in petitioner's 2,400 shares of stock. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩